## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AQUATROL CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CV-03-252J |
| | ) |
| ALTOONA CITY AUTHORITY and | ) JUDGE GIBSON |
| G.M. McCROSSIN, INC., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION and ORDER OF COURT

### SYNOPSIS

This matter comes before the Court on a Motion for Summary Judgment filed by Defendant G.M. McCrossin, Inc. (Document No. 14), a Motion for Summary Judgment filed by Defendant Altoona City Authority (Document No. 16) and a Motion to Strike filed by the Plaintiff (Document No. 27). For the reasons stated herein, the Motion for Summary Judgment filed by Defendant G.M. McCrossin, Inc. (Document No. 14) is denied, the Motion for Summary Judgment filed by Defendant Altoona City Authority (Document No. 16) is denied and the Motion to Strike filed by the Plaintiff (Document No. 27) is denied as moot.

### BACKGROUND

The Altoona City Authority (hereinafter "Authority") operates five water treatment plants in Blair County, Pennsylvania. (Document No. 18, p. 1). The Authority entered into a contract with G.M. McCrossin, Inc., (hereinafter "McCrossin") known as the Horseshoe Curve Water Treatment Facility

1

Project (hereinafter "Project"). (Document No. 18, p. 1). The comprehensive nature of the Project included more work than is at issue in the instant case. Part of the Project included the upgrading of the computer systems at five of the Authority's water treatment plants. (Document No. 18, p. 1). Apparently, the upgrades were needed because of the impending Y2K computer problems associated with the arrival of the new millennium.

In January of 1999, McCrossin entered into a subcontract with Aquatrol Corporation (hereinafter "Aquatrol") to provide for the installation, configuring and upgrading of software of computers at five of the Authority's water treatment plants. (Document No. 1, p. 2). In April of 1999, McCrossin and Aquatrol fully executed a purchase order in which McCrossin agreed to pay Aquatrol $140,849.00 for the relevant work. (Document No. 20, p. 2). The work was to be completed by December 31, 1999, and in accordance with specifications prepared by Gwin, Dobson & Foreman, Inc. (hereinafter "GD&F"), the Authority's consulting engineer. (Document No. 20, p. 2). McCrossin selected Aquatrol to perform the upgrades because Aquatrol-installed computer systems comprised the operating equipment at the five treatment plants. (Document No. 18, p. 2).

As the end of 1999 approached, it became apparent that the work would not be completed as expected. There were computer complications which resulted in shutdowns. (Document No. 18, p. 2). On December 9, 1999, McCrossin General Superintendent Robert F. Leahey (hereinafter "Leahey") sent a letter to Aquatrol President Jim McDermott (hereinafter "McDermott") expressing concern that the software and files were not transferring in the manner that had been expected. (Document No. 14, Exhibit 2). The problems persisted into the beginning of the year 2000.

On January 7, 2000, GD&F employee William A. Sauserman (hereinafter "Sauserman") sent

2

a letter to Leahey indicating that the upgrade had not been successful and that the specifications had not been met. (Document No. 14, Exhibit 3). The letter further stated that software compatibility problems existed, that Aquatrol had not provided training and troubleshooting assistance, and that full payment for the upgrades would not occur until these problems were resolved. (Document No. 14, Exhibit 3, p. 2). Leahey immediately forwarded this letter to McDermott. McDermott responded with a letter dated February 10, 2000. (Document No. 14, Exhibit 4, pp. 1-2). In that letter, McDermott relayed his belief that the Wonderware software was not working because Wonderware had secretly instituted some kind of a change to which it would not admit. (Document No. 14, p. 1).

On March 16, 2000, Sauserman sent a letter to Leahey indicating that payment would not be made until Aquatrol was able to complete the upgrade in its entirety, and that permitting incomplete software installations or upgrades would jeopardize the functioning of the City of Altoona's water treatment system. (Document No. 14, Exhibit 6, p. 2). A copy of this letter was forwarded to McDermott on March 29, 2000. (Document No. 14, Exhibit 6, p. 1).

Apparently, the Authority remained dissatisfied with the progress of the upgrades. On November 20, 2000, Sauserman sent a letter to Leahey stating that if the upgrades were not completed in accordance with the applicable specifications as of December 31, 2000, GD&F would be eliminating this portion of the work from the Project contract and would be issuing a change order-credit in the amount of $147,489.00. (Document No. 14, Exhibit 7). Aquatrol received a copy of the letter the next day. (Document No. 14, Exhibit 8).

Aquatrol, through McDermott, responded with a direct proposal to the Authority on December 12, 2000. (Document No. 14, Exhibit 9, pp. 1-2). In that proposal, Aquatrol recommended that the

3

Authority's Prosoft 486 computers be replaced with "Pentium III computers running Prosoft NT." (Document No. 14, Exhibit 9, p. 1). This recommendation was made with the expectation that the Wonderware computers would work in a reliable manner. (Document No. 14, Exhibit 9, p. 1). McDermott further indicated that one installation should go forward in order to verify that the problem had been correctly identified, and that the work at the other four plants would proceed thereafter. (Document No. 14, Exhibit 9, p. 2). McDermott also stated that the original subcontract price of $140,849.00, along with an additional $53,000.00 associated with the new proposal, would be due only upon successful completion of the work at all five facilities. (Document No. 14, Exhibit 9, p. 2).

The Authority's response came in the form of a January 4, 2001, letter from M. David Halpern (hereinafter "Halpern") who was the solicitor for the Authority. (Document No. 14, Exhibit E, pp.1-2). In that letter, Halpern indicated that the cost of the personnel required to bring the system into compliance with the applicable specifications had been a part of the original contract price, and that the Authority was unwilling to absorb this additional cost. (Document No. 14, Exhibit E, pp.1-2). Halpern's letter went on to state as follows:

"1.    You will provide personnel and equipment to upgrade one site, Plane Nine, and demonstrate within thirty (30) days of the commencement date that the facility will function in accordance with the original specifications with the upgraded system.

2.    If, in fact, you are successful in bringing the one plant into compliance, you would then mirror that installation at all other facilities and, upon satisfactory completion, the Authority will pay you for the hardware and software upgrades per your proposal of December 12, 2000, attached hereto, and release the retainage for the original work, bringing this matter to a close, excepting however, any post-completion warranties provided for in the contract documents and law."

4

(Document No. 14, Exhibit E, pp. 1-2). Aquatrol did not accept the Authority's proposal on account of the Authority's refusal to pay for an Aquatrol employee's labor and expenses. (Document No. 22, Exhibit 2, p. 4). On April 24, 2001, Leahey sent a letter to McDermott stating that the Authority had issued a "deduct change" for the entire amount of the subcontract, and that the computers and monitors had been packaged at one of the treatment plants so that Aquatrol could retrieve them. (Document No. 14, Exhibit 10).

The Authority issued a credit change order on May 16, 2001, deleting the total value of Aquatrol's scope of the Project from McCrossin's contract. (Document No. 19, p. 2). Thereafter, on October 1, 2001, McDermott sent a letter to the Authority indicating that Aquatrol had discovered the cause of the problems and, after conferring with Wonderware personnel, had learned of the steps needed to correct the problems.[1] (Document No. 14, Exhibit I, pp. 1-2). In that letter, he stated that Aquatrol was willing to perform the work for the original contract price of $140,849.00. (Document No. 14, Exhibit I, p. 2). Apparently, the Authority declined Aquatrol's offer. (Document No. 18, p. 3; Document No. 20, p. 5).

On June 18, 2002, Attorney Dennis J. Lewis sent a letter to both Leahey and Mark Perry, who worked for the Authority, demanding that Aquatrol be paid the sum of $242,000.00. (Document No.

---

[1] The Authority's Pretrial Narrative Statement indicates that Aquatrol personnel left the job site on February 1, 2001. (Document No. 18, p. 3). McCrossin's Pretrial Statement states that Aquatrol continued to work directly for the Authority until March, 2002, "at which time the Authority allegedly advised Aquatrol that its work was unacceptable and [that] the Authority no longer had any use for Aquatrol's services." (Document No. 19, p. 2). Aquatrol's complaint states that it was informed by the Authority in March, 2002, that it had decided to change its computer systems and software, and that the Authority was no longer in need of Aquatrol's upgrades. (Document No. 1, p. 3). The statement by McCrossin noted above may have simply been a misinterpretation of Aquatrol's complaint. Aquatrol and the Authority appear to be in agreement that Aquatrol's work for the Authority ceased during the spring of 2001. (Document No. 18, p. 3; Document No. 20, p. 5).

14, Exhibit J, pp. 1-2). That amount included $101,111.00 for extra labor and expenses provided at the request of the Authority and $140,849.00 for the original contract price. (Document No. 14, Exhibit J, p. 2). The bill was never paid.

In July of 2002, the Authority entered into a contract with U.S. Filter Control Systems to provide the needed upgrades in the five treatment plants. (Document No. 18, p. 4). Under this subsequent contract, the Authority agreed to pay $966,842.00 for the upgrades, which exceeded the price of McCrossin's original subcontract with Aquatrol by $825,993.00. (Document No. 6, p. 7).

On November 13, 2003, Aquatrol filed a complaint in this Court against McCrossin and the Authority. (Document No. 1). The first count in the complaint is a breach of contract claim against McCrossin, while the second and third counts are unjust enrichment (and/or quantum meruit) and promissory estoppel claims against the Authority. (Document No. 1, pp. 4-6). McCrossin filed an answer on December 5, 2003, which included a cross claim against the Authority for contribution or indemnity. (Document No. 5, p. 2). On January 5, 2004, the Authority filed its answer, which included a counterclaim against Aquatrol for the $825,993.00 difference between its contract with U.S. Filter Control Systems and the original contract with McCrossin. (Document No. 6, p. 7).

McCrossin filed a Motion for Summary Judgment on December 1, 2004. (Document No. 14). On December 10, 2004, the Authority filed a Motion for Summary Judgment. (Document No. 16). In support of its Motion for Summary Judgment, the Authority filed a supplemental affidavit on February 2, 2005. (Document No. 26). Aquatrol responded on February 22, 2005, by filing a Motion to Strike this supplemental affidavit. (Document No. 27). These three motions are currently pending before the Court and are, therefore, the subject of this opinion.

## **JURISDICTION**

Aquatrol is a corporation organized under the laws of Illinois, and its principal place of business is located in Orland Park, Illinois. (Document No. 1, p. 1). The Authority maintains its offices in Altoona, Pennsylvania. (Document No. 1, p. 1). McCrossin is a Pennsylvania corporation, and its principal place of business is in Centre County, Pennsylvania. (Document No. 1, p. 1). The amount in controversy exceeds the sum of $75,000.00. Therefore, this Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1332(a)(1).

## **SUMMARY JUDGMENT STANDARDS**

"Summary judgment is appropriate only when it is demonstrated that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-32, 106 S.Ct. 2548, 2552-57, 91 L.Ed.2d 265, 273-280 (1986); Fed.R.Civ.P. 56(c). An issue of material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211-212 (1986). In deciding a motion for summary judgment, all reasonable inferences must be drawn in favor of the non-movant. *Oritani [Sav. And Loan Ass'n v. Fidelity and Deposit Co.*, 989 F.2d 635, 638]."

*Troy Chemical Corp. v. Teamsters Union Local No. 408*, 37 F.3d 123, 125-126 (3d Cir. 1994).

"As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. See generally 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2725, pp. 93-95 (1983). This materiality inquiry is independent of and separate from the question of the incorporation of the evidentiary standard into the summary judgment determination. That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs. Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry, since materiality is only a criterion for categorizing factual disputes in their relation to the legal elements of the claim and not a criterion for evaluating the evidentiary underpinnings of those disputes."

7

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986).

## McCROSSIN'S MOTION FOR SUMMARY JUDGMENT

McCrossin filed a Motion for Summary Judgment with regard to Aquatrol's breach of contract claim. (Document No. 15, p. 4). In support of its motion, McCrossin makes two distinct arguments. The first argument advanced by McCrossin is that Aquatrol's breach of contract claim cannot proceed because the underlying subcontract was rescinded. (Document No. 15, p. 4). McCrossin's second argument is that summary judgment is warranted because the subcontract was not performed to the satisfaction of the Authority. (Document No. 15, p. 4). The Court will proceed to address each of these arguments.

Since this Court's jurisdiction is predicated on the diverse citizenship of the parties, the Court must apply the choice of law rules applicable in the Commonwealth of Pennsylvania. *Klaxon v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496-497, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The parties in this case are in apparent agreement that the substantive law of Pennsylvania should be applied with respect to each issue. (Document Nos. 15, 17, 22, 24 and 28). Therefore, the Court will evaluate the substantive issues in this case under Pennsylvania law. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78-80, 58 S.Ct. 817, 822-823, 82 L.Ed. 1188, 1194-1195 (1938).

The first argument advanced by McCrossin is that the subcontract on which Aquatrol attempts to recover was rescinded and replaced by a subsequent contract between Aquatrol and the Authority. (Document No. 15, p. 5). Aquatrol responds with two alternative refutations of McCrossin's claim. First, Aquatrol contends that the Authority, as a third-party beneficiary to the underlying subcontract between McCrossin and Aquatrol, had no authority to rescind the contract. (Document No. 22, p. 11).

8

Second, Aquatrol argues that even if the Authority had such authority, there was no subsequent contract between Aquatrol and the Authority which replaced the subcontract. (Document No. 22, pp. 11-16).

Under Pennsylvania law, "[p]arties to a written contract may abandon, modify or change it either by words or conduct." *Parking Auth. of the City of Wilkes-Barre v. Ten East South Street Co.*, 788 A.2d 1096, 1101 (Pa. Commw. Ct. 2001) ( quoting *Barr v. Deiter*, 154 A.2d 290, 293 (1959)). "The parties to a contract may at any time rescind it, either in whole or in part, by mutual consent, and the *surrender of their mutual rights* is sufficient consideration." *Dreifus v. Columbia Exposition Salvage Co.*, 45 A. 370, 371 (Pa. 1900) (emphasis added). Where there is no ambiguity in the agreement to rescind the underlying contract, a court may determine as a matter of law that the provisions of that contract have been rescinded. *Wathen v. Brown*, 189 A.2d 900, 903 (Pa. Super. Ct. 1963).

In opposition to McCrossin's Motion for Summary Judgment, Aquatrol asserts that a rescission by the Authority was legally impossible, given that the Authority was not a party to the subcontract. (Document No. 22, p. 11). There is limited case law on this point, perhaps because it is well understood that a third party beneficiary cannot rescind a contract to which it has only the limited right to receive the benefits. After review of the relevant case law, the Court cannot find Pennsylvania case law on point.

In the absence of Pennsylvania case law which is on point, this Court must attempt to ascertain how the Supreme Court of Pennsylvania would decide this issue if it were presented with the same question. *Wichita Royalty Co. v. City Nat'l Bank of Wichita Falls*, 306 U.S. 103, 59 S.Ct. 420, 83 L.Ed. 515 (1939). In various contexts, Pennsylvania courts have recognized the value of decisions from the courts of other states in determining the applicable law in Pennsylvania. *Sabad v. Fessenden*, 825 A.2d

9

682, 695 (Pa. Super. Ct. 2003). Indeed, the Pennsylvania Supreme Court *requires* attorneys to discuss

precedents from other states when briefing the interpretation of analogous provisions of the

Pennsylvania Constitution. *Commonwealth v. Edmonds*, 586 A.2d 887, 895 (Pa. 1991). Therefore, in

the absence of clear direction from the Pennsylvania courts, this Court will look to the relevant case law

from other jurisdictions.

Aquatrol cites *Northwest Fin. Leasing, Inc. v. Morgan Whitney, Inc.*, 787 F.Supp. 895 (D.Minn.

1992), a case governed by Minnesota law, to support its argument that the contract cannot be rescinded.[2]

In *Northwest Fin. Leasing, Inc.* the court explained that "a party to a contract cannot assign its right to

rescind a contract without also assigning the other rights and obligations of the contract." 787 F.Supp.

at 899. Therefore, a third-party beneficiary would not have had standing to rescind a *fully-performed*

contract to which it was not a party. *Id.*

Additionally, the Court found that the Court of Appeal of California, Fourth Appellate District,

Division Three, recently commented, albeit within the context of construing a California statute, on the

issue of whether a third-party beneficiary may rescind an existing contract in *Schauer v. Mandarin

Gems of California, Inc.*, 125 Cal. App. 4th 949 (Cal. Ct. App. 2005):

> "We have found no cases specifically holding the rescission remedy unavailable to a
> third party beneficiary, but the proposition is self-evident to a degree that might well
> explain the absence of precedent. *Civil Code section 1559* grants a third party
> beneficiary the right to *enforce* the contract, not rescind it, and *Civil Code section 1689*
> limits its grant of rescission rights to the contracting parties. Not only do the relevant
> statutes demand making rescission unavailable to a third party beneficiary, but common

---

[2]To support its argument, Aquatrol also relies on the Pennsylvania Commonwealth Court's decision in *Gleim v. Bear*, 616 A.2d 1064 (Pa. Commw. Ct. 1992), however, *Gleim* does not shed much light on this issue because the Commonwealth Court was interpreting various provisions of Pennsylvania's Township Code that have no application in the case *sub judice. Gleim*, 616 A.2d at 1066-1068.

sense compels the conclusion. The interest of the third party beneficiary is as the intended recipient of the *benefits* of the contract, and a direct right to those benefits, i.e., specific performance, or damages in lieu thereof, will protect the beneficiary's interests. Rescission, on the other hand, extinguishes a contract between the parties. (*Civ. Code, § 1688.*) Plaintiff, not having participated in the agreement, not having undertaken any duty or given any consideration, is a stranger to the agreement, with no legitimate interest in voiding it. As a matter of law, without an assignment of [a party's] contract rights, plaintiff cannot rescind the sales contract to which she was not a party."

*Schauer v. Mandarin Gems of California*, 125 Cal. App. 4th 949, 959-960 (Cal. Ct. App. 2005).

The Court agrees with the reasoning in *Northwest Fin. Leasing, Inc.* and *Schauer* that a third party beneficiary cannot rescind a contract. Therefore, the Court finds that the Authority, as a third party beneficiary of the contract between McCrossin and Aquatrol, could not rescind the subcontract between McCrossin and Aquatrol. Accordingly, McCrossin's request for summary judgment on this basis is denied.

In opposition to McCrossin's argument that Aquatrol rescinded the subcontract by its conduct, Aquatrol first argues that the subcontract between Aquatrol and McCrossin was not rescinded by its conduct. (Document No. 22, pp. 11-16). In the alternative, Aquatrol contends that even if the subcontract was rescinded, it was not rescinded within a reasonable time. (Document No. 22, p. 15, n. 7). After a thorough review of the record, the Court is convinced that a genuine issue of material fact exists with regard to both of these issues. Because the second issue raises a narrower question than the first, the Court will address the second issue in order to determine whether the evidence advanced by Aquatrol is sufficient to defeat McCrossin's Motion for Summary Judgment.

In *Fichera v. Gording*, 227 A.2d 642 (Pa. 1967), the Pennsylvania Supreme Court stated the clearly established rule governing rescission under Pennsylvania law:

11

> When a party discovers facts which warrant rescission of his contract, it is his duty to act promptly, and, in case he elects to rescind, to notify the other party without delay, or within a reasonable time. If possible, the rescission should be made while the parties can still be restored to their original positions. Failure to rescind within a reasonable time is evidence, and may be conclusive evidence, of an election to affirm the contract.

*Fichera*, 227 A.2d at 643-644, (internal quotation marks and citations omitted). Aquatrol argues that, "[a]t a minimum, a question of material fact exists with regard to whether the Contract was cancelled within a reasonable time." (Document No. 22, p. 15, n. 7). Aquatrol's basic argument is that while McCrossin had threatened to cancel the subcontract in December of 2000, the actual rescission or cancellation did not occur until May of 2001. (Document No. 22, p. 15, n. 7). There is clearly a significant difference between the period of time at issue in *Fichera* and the period of time at issue in the instant case. In *Fichera*, the applicable period of time was five *years*. *Fichera*, 227 A.2d at 644. In this case, the applicable period of time is five *months*. Nonetheless, the Pennsylvania Supreme Court did not purport to determine what constitutes a "reasonable time," and this Court has no basis in law for concluding that an intervening period of only five months is *per se* reasonable. For this reason, the Court is in agreement with Aquatrol that McCrossin's Motion for Summary Judgment must be denied.

Aquatrol contends that it "never intended to, consented to, or agreed to cancel its contract with McCrossin for the upgrades in the Authority's five treatment plants." (Document No. 22, Exhibit 2, p. 4). The law of Pennsylvania, as it relates to rescission, was explained by the Pennsylvania Superior Court in *Kirk v. Brentwood Manor Homes, Inc.*, 159 A.2d 48 (Pa. Super. 1960):

> The agreement to rescind a written contract need not be expressed in words, but may be inferred from the acts and declarations of the parties. *Weldon & Kelly Co. v. Pavia Co.*, 354 Pa. 75, 46 A.2d 466. All that is necessary is a mutual agreement. *Robert's Estate*, 380 Pa. 600, 112 A.2d 394. Whether or not the parties have so agreed is a question of intention, and the existence of such intention is ordinarily an issue for the jury.

12

*Kirk*, 159 A.2d at 51. Despite McCrossin's contention that Aquatrol's conduct rescinded the subcontract and replaced it with a direct contract, Aquatrol has presented evidence to the contrary. (Document No. 22, Exhibit 2).

In support of its position that it never formed a direct contract with the Authority, Aquatrol has presented McDermott's affidavit. (Document No. 22, Exhibit 2). In that affidavit, McDermott stated that Aquatrol did not agree to cancel the subcontract with McCrossin, accept a later proposal from the Authority, or sign the letter sent by the Authority's solicitor. (Document No. 22, Exhibit 2, p. 4). An unsigned copy of the Authority's proposal is also submitted as evidence that Aquatrol did not accept the Authority's terms. (Document No. 22, Exhibit 17, pp. 1-2). This evidence creates a genuine issue of material fact which is sufficient to defeat McCrossin's Motion for Summary Judgment.

In addition, the Court notes that McCrossin's assertion that "Aquatrol continued to perform work directly for the Authority under the new Authority/Aquatrol Contract until March, 2002" may be an erroneous interpretation of Aquatrol's complaint. In support of this contention, McCrossin cites to Exhibit "A" of its own Motion for Summary Judgment, which is nothing more than a copy of Aquatrol's complaint. (Document No. 14, Exhibit A, pp. 1-6; Document No. 15, p. 6). Aquatrol's complaint states as follows:

> In or about March 2002, the ACA [Authority] informed Aquatrol that it had decided to change its computer systems and software and that, therefore, it no longer needed the software work and upgrades from Aquatrol.

(Document No. 14, Exhibit A, p. 3). Although a reasonable person reading this allegation in isolation could conclude that Aquatrol personnel continued to work at the Authority's five treatment plants until March of 2002, other portions of the record reveal that Aquatrol personnel had actually left the job site

13

a year earlier. (Document No. 18, p. 3; Document No. 20, p. 5). Apparently, Aquatrol's work at the treatment plants ended during the spring of 2001. When Wonderware contacted Aquatrol about the ongoing problems in October of 2001, Aquatrol personnel were already gone from the Authority's plants. (Document No. 22, Exhibit 2, p. 4). McCrossin's erroneous understanding of the underlying facts seriously undermines its contention that summary judgment is warranted. Consequently, a genuine issue of material fact exists as to whether the subcontract was, in fact, rescinded and replaced with a direct contract between the Authority and Aquatrol. The question of "whether the parties made an agreement is a question of fact to be determined by the jury." *Nat'l Products Co., Inc. v. Atlas Fin. Corp.*, 364 A.2d 730, 733 (Pa. Super. 1976).

Next, McCrossin makes an alternative argument in support of its Motion for Summary Judgment. This argument is based on the language of the contract. According to McCrossin, Aquatrol cannot recover for breach of contract without demonstrating that the Authority was, in fact, satisfied with Aquatrol's performance. (Document No. 15, pp. 7-10). McCrossin relies on the contractual language which required Aquatrol to "[f]urnish all material, labor, equipment and services as necessary for the complete and satisfactory installation of specification sections as listed [in the contract documents] prepared by Gwin, Dobson & Foreman, Inc." (Document No. 15, pp. 7-10; Document No. 22, Exhibit 1, p. 1). In *Jenkins Towel Service, Inc. v. Tidewater Oil Co.*, 223 A.2d 84 (Pa. 1966), the Supreme Court of Pennsylvania addressed the status of the law governing contracts which require the satisfaction of the party for whom services are rendered:

"Such contracts are not strangers to the law of Pennsylvania and have been considered by us on numerous previous occasions. We have consistently held that where a contract provides for performance by one party to the satisfaction of the other, the test of

14

> adequate performance is not whether the person for whom the service was rendered *ought* to be satisfied, but whether he *is* satisfied, there being, however, this limitation, that any dissatisfaction on his part must be genuine and not prompted by caprice or bad faith."

*Jenkins Towel Service, Inc.*, 223 A.2d at 86, (emphasis added; internal quotation marks omitted).

Aquatrol responds by arguing that the contractural terms are ambiguous and, therefore, suitable for a determination by the finder of fact. In *Allegheny International, Inc. v. Allegheny Ludlum Steel*, 40 F.3d 1416 (3d Cir. 1994), the U.S. Court of Appeals for the Third Circuit explained that, "[u]nder Pennsylvania law, ambiguous writings are interpreted by the fact finder and unambiguous writings are interpreted by the court as a question of law." *Allegheny International, Inc.*, 40 F.3d at 1424. Aquatrol argues that the contract did not include an unambiguous requirement that the work be done to the satisfaction of the Authority. (Document No. 22, p. 18). Instead, Aquatrol contends that the contract required only GD&F's approval of the specific items to be installed. (Document No. 22, p. 18).

Aquatrol attempts to distinguish some of the cases relied upon by McCrossin. (Document No. 22, p. 19). For instance, in *John Conti Co., Inc. v. Donovan*, the contract specifically stated that "All work must be made satisfactory to the Architect before any payments on work will be allowed." 57 A.2d 872, 873 (Pa. 1948). The contract further provided that the word "Satisfactory" was to be "taken to mean as decided by the Architect." *Id.* The contractual language at issue in the instant case obviously does not speak with such clarity. Furthermore, McCrossin's argument is not helped by the language in the contract which indicates that McCrossin reserved the right to cancel if the order was not "filled as *specified*." (Document No. 15, p. 9). As Aquatrol points out, this language has more to do with the specific nature of the work itself rather than with the satisfaction of either the Authority or

15

GD&F. (Document No. 22, p. 19, n. 9). The Court is, therefore, convinced that the contractual language is ambiguous. For this reason, the resolution of this issue is properly presented for a determination by the finder of fact.

Given the Court's determination that a genuine issue of fact remains as to whether the contract required that the Authority be satisfied with Aquatrol's performance, McCrossin's Motion for Summary Judgment must be denied on that ground alone. Nonetheless, even if it were clear that the contract required such satisfaction as a condition of payment, a factual issue would remain as to whether the Authority's withholding of approval was in good faith. In *Morgan v. Gamble*, 79 A. 410, 414 (Pa. 1911), the Pennsylvania Supreme Court stated as follows:

> "The contract provides that the contractor shall furnish all the materials and perform all the work to the satisfaction of the owner. We have uniformly upheld such contracts and required their observance. Under a contract of that character it is the duty of the contractor to perform to the satisfaction of the owner, and that is the standard by which the sufficiency of the work is to be tested. It is not for the court or the jury to determine whether the work is being done in compliance therewith, but solely for the owner to determine, and with his decision the contractor must comply. Of course, the dissatisfaction of the owner which will defeat a recovery by the contractor must be real and genuine, and not one prompted by caprice or bad faith, or for the purpose of evading payment of the balance due the contractor. If the objections made by the owner are bona fide, and not unreasonable or capricious, they must be sustained. The question is generally for the jury, but the evidence may be such as to require the court to withdraw the case from the jury."

According to McDermott's affidavit, the Authority informed Aquatrol in March of 2002, that the money being withheld from Aquatrol would be applied toward the new contract which the Authority had formed with U.S. Filter Control Systems. (Document No. 22, Exhibit 2, p. 4). Aquatrol contends that it had offered to correct the problems for the original contract price in October of 2001, after being contacted by Wonderware. (Document No. 22, Exhibit 2, p. 4). Under these circumstances, there is

16

clearly a factual dispute over whether the Authority's refusal to permit the correction attempt was motivated by a desire to avoid payment and to pursue an alternative way of upgrading the software at the five treatment plants.

Aquatrol relies on three cases from other States for the proposition that it is not responsible for defects resulting from its adherence to the specifications prepared by GD&F. (Document No. 22, pp. 21-22). The first is the decision of the Supreme Court of Washington in *Clark v. Fowler*, 363 P.2d 812 (Wash. 1961). In *Clark*, the Supreme Court of Washington stated as follows:

"If the furnace met the specifications of the respondents' architect and was installed according to respondents' plans and contract, but failed to function properly because of the improper design (approved by respondents' architect) of ducts, outlets, and cold air returns, the findings of fact do not support a conclusion of legal liability on the part of the appellant contractor. The architect was the agent of the respondents. When the architect approved the design and the contractor installed the furnace in conformity with it, the contractor's obligation to the respondents under the contract, in this respect, was fulfilled."

*Clark*, 363 P.2d at 815. The second case relied upon by Aquatrol is *Puget Sound Nat'l. Bank of Tacoma v. C.B. Lauch Const. Co.*, in which the Supreme Court of Idaho stated that "[a] contractor is required to follow the plans and specifications and when he does so, he cannot be held to guarantee that the work performed as required by his contract will be free from defects, or withstand the action of the elements, or that the completed job will accomplish the purpose intended." 245 P.2d 800, 805 (Idaho 1952). The third case which Aquatrol calls to the Court's attention is *State v. Commercial Casualty Ins. Co.*, 248 N.W. 807 (Neb. 1933). In that case, the Supreme Court of Nebraska explained that "[w]here the contract specifies what the [contractor] is to do and the manner and method of doing it, and he does the work specified in the manner specified, his engagement is fulfilled and he remains liable only for

17

defects resulting from improper workmanship or other fault on his part." *Id.* at 811.

Aquatrol relies on these cases to buttress its claim that the problems resulting from GD&F's allegedly defective plan cannot serve as a basis for McCrossin's refusal to pay Aquatrol for its services. In his affidavit, McDermott stated that the software difficulties experienced by the Authority "were due to the design and engineering flaws of GD&F linking old technology with new technology, and problems inherent in the Wonderware and Met One software, and were not due to any failure of Aquatrol to perform the work as specified." (Document No. 22, Exhibit 2, p. 3). McCrossin does not specifically address this issue, choosing to rely instead on its assumption that Aquatrol's contractual obligations were not met because of the Authority's dissatisfaction with the work. (Document No. 15, pp. 7-10). Nonetheless, this Court has already decided that a factual issue remains regarding the interpretation of the contractual language dealing with satisfaction. For this reason, McCrossin's Motion for Summary Judgment cannot be granted.

In its final argument, McCrossin contends that since it had no control over the Authority's actions, it cannot be held liable to Aquatrol for any breach of the subcontract. (Document No. 15, pp. 9-10). *John Conti Co., Inc.* is the only case cited by McCrossin in support of this argument. As noted earlier, however, *John Conti Co., Inc.* does not control this case because the contractual language at issue in that precedent was unmistakably clear, whereas the language in the instant contract lacks such clarity. Therefore, McCrossin's argument that it is not responsible for the Authority's actions must rest on some other basis if it is to succeed.

In opposing McCrossin's Motion for Summary Judgment, Aquatrol relies on the decision of the U.S. Court of Appeals for the Third Circuit in *Pierce Assocs., Inc. v. Nemours Found.*, 865 F.2d 530

18

(3d Cir. 1988). (Document No. 22, pp. 24-25). In *Pierce*, the Court of Appeals applied the law of

Delaware. Relying on the Delaware Supreme Court's decision in *Oliver B. Cannon & Sons, Inc. v.*

*Dorr-Oliver, Inc.*, 336 A.2d 211 (Del. 1975), the Court of Appeals spoke of a "buffer zone" between

a property owner and a subcontractor. *Pierce*, 865 F.2d at 536. The Court went on to state as follows:

"There is nothing to prevent a departure from the typical pattern, and, as was the case
in *Cannon*, a contractor and subcontractor may agree to confer upon an owner rights
which are enforceable directly against the subcontractor. However, an intent to do so
must be found in the contract documents."

*Pierce*, 865 F.2d at 536. Admittedly, the situation is reversed here. In *Pierce*, the owner sought to

recover from the subcontractor. In this case, the subcontractor seeks to recover from a general

contractor, who was hired by the property owner. In any event, the logical reasoning of the Court of

Appeals in *Pierce* tends to support Aquatrol's position on this issue. McCrossin contracted with

Aquatrol and is, therefore, amenable to suit for any relevant breach of that contract. This case, of

course, is not governed by Delaware law. Nonetheless, *John Conti Co., Inc.* does not control this case,

and McCrossin cites to no other case in support of its position. A genuine issue of material fact remains

as to whether the subcontract between Aquatrol and McCrossin was rescinded and replaced by a direct

contract between Aquatrol and the Authority. Assuming *arguendo* that no such rescission occurred,

as the Court must for purposes of McCrossin's Motion for Summary Judgment, there is no reason why

McCrossin, as a party to the subcontract, cannot be held liable for breaching that contract.[3]

---

[3]In so concluding, the Court notes that McCrossin has filed a cross claim against the Authority for contribution and
indemnification. (Document No. 5, pp. 6-7). Since the matter is currently before the Court on the Motions for Summary
Judgment filed by McCrossin and the Authority (Document Nos. 14 and 16), and Aquatrol's Motion to Strike (Document
No. 27), the validity of McCrossin's cross claim is not presently at issue. In concluding that Aquatrol may proceed with its
breach of contract claim against McCrossin, the Court expresses no opinion regarding any issues related to McCrossin's

Accordingly, the Court must deny McCrossin's Motion for Summary Judgment. (Document No. 14).

## THE AUTHORITY'S MOTION FOR SUMMARY JUDGMENT

The Authority has also filed a Motion for Summary Judgment. (Document No. 16). The claims against the Authority are based on unjust enrichment and promissory estoppel. In support of its Motion for Summary Judgment, the Authority advances two distinct arguments to the effect that Aquatrol cannot prevail on an unjust enrichment (and/or quantum meruit) theory. The first is that the Authority received no benefit from Aquatrol's work and was, therefore, not *enriched*. (Document No. 17, p. 3). The second argument advanced by the Authority is that there was an express contract which governed the engagement, thereby precluding recovery on an unjust enrichment theory. (Document No. 17, p. 3). With regard to the Authority's second argument, the Court has already determined that a genuine issue of material fact exists as to whether Aquatrol and the Authority entered into a direct contractual relationship after the purported cancellation of the subcontract. Therefore, the Authority's Motion for Summary Judgment cannot be granted on the ground that an express contract existed between it and Aquatrol. The Court will proceed to evaluate both of the Authority's arguments, but any discussion of the second will be limited to the question of whether Aquatrol's subcontract with McCrossin, a party to the general contract with the Authority, precludes Aquatrol's recovery from the Authority on an unjust enrichment theory.

The law of Pennsylvania is very clear with regard to the ability of a subcontractor to recover from a property owner on an unjust enrichment theory. If any benefit was conferred upon the Authority

_____

contribution and/or indemnity claim against the Authority.

20

as a result of Aquatrol's work, the amount of that benefit must be measured by the value of that benefit

to the owner and not by the amount of the contract price. *D.A. Hill Co. v. Clevetrust Realty Investors*,

573 A.2d 1005, 1009 (Pa. 1990). "Furthermore, the owner's retention of the benefit without paying any

compensation to the subcontractor would not be unjust if the owner did not contract directly with or

*mislead the subcontractor*." *Ravin, Inc. v. First City Co.*, 692 A.2d 577, 581 (Pa. Super. Ct. 1997)

(emphasis added; internal quotation marks omitted). Very recently, the Pennsylvania Commonwealth

Court elaborated on these standards:

> "From this foregoing authority, we see that a claim in quantum meruit for unjust
> enrichment is, by nature, fact-sensitive. The polestar of the unjust enrichment inquiry
> is whether the defendant has been *unjustly* enriched; the intent of the parties is
> irrelevant. *Meehan* and *D.A. Hill* teach us that where a third party benefits from a
> contract entered into between two other parties, the third party's retention of the benefit
> without paying any compensation to the aggrieved contracting party will not be unjust
> if the party enjoying the benefit did not mislead the subcontractor. The facts in *D.A.
> Hill* dealt with a traditional construction contract where the property owner relies upon
> the general contractor to choose the subcontractors. The opinion notes the absence of
> a direct contract between the subcontractor and the property owner, but this will always
> be the case where the plaintiff seeks relief under a theory of *quantum meruit*. The real
> question is whether the property owner had direct dealings with the subcontractor,
> which caused the subcontractor to perform work."

*Limbach Co., LLC v. City of Philadelphia*, __A.2d__, 2006 WL 2041748 *8 (Pa. Commw. Ct. 2006).

As noted earlier, the question of whether Aquatrol and the Authority formed a direct contract

is open for a determination by the finder of fact. Consequently, the resolution of the present Motion

for Summary Judgment depends upon whether there is a genuine issue of material fact regarding

Aquatrol's "direct dealings" with the Authority. McDermott's affidavit establishes an issue of material

fact with regard to this issue. He alleges that the Authority urged Aquatrol to continue working for the

purpose of remedying the problems with the Wonderware materials. (Document No. 22, Exhibit 2, pp. 3-5). A reasonable finder of fact may conclude that these communications were misleading in that they indicated that the Authority would permit Aquatrol to complete the work for a valuable consideration.

Aquatrol contends that the Authority benefitted from Aquatrol's work, and that the Authority had accepted "a minor set point delay" until unionized plant operators began to complain. (Document No. 24, p. 7). This argument is supported by McDermott's affidavit. (Document No. 22, Exhibit 2, p. 5). This assertion, if true, would serve as a refutation of the Authority's argument that it has not been enriched. Accordingly, the Court must deny the Authority's Motion for Summary Judgment with respect to the unjust enrichment and/or quantum meruit claim. (Document No. 16).

The Authority also seeks summary judgment with respect to Aquatrol's promissory estoppel claim. (Document No. 16). Under Pennsylvania law, the doctrine of promissory estoppel applies if it is shown that "one party induced the other to act" and that "the other party justifiably relied on the inducement." *Ravin, Inc.*, 692 A.2d at 581. "Promissory estoppel does not apply if the complaining party acted on his own will and not as a result of the defendant's representations." *Ravin, Inc.*, 692 A.2d at 581. The Authority contends that any promise made by the Authority was contained within the four corners of Halpern's letter dated January 4, 2001, and that this letter contained no promise that Aquatrol "would be paid for anything other than a satisfactory result." (Document No. 17, p. 4). Nonetheless, McDermott's affidavit clearly establishes a genuine issue of material fact as to whether the proposal made in that letter was accepted by Aquatrol. (Document No. 22, Exhibit 2, p. 4). McDermott's affidavit also establishes the existence of a factual issue as to whether the Authority's personnel "repeatedly requested and encouraged Aquatrol to continue to perform work and make

22

improvements to the Wonderware and Proserver software." (Document No. 22, Exhibit 2, p. 3).

The Supreme Court of Pennsylvania discussed promissory estoppel under Pennsylvania law in *Lobolito, Inc. v. North Pocono Sch. Dist.*, 755 A.2d 1287 (Pa. 2000). Recovery under this theory is limited to "the amounts lost and expended on the promise." *Lobolito, Inc.*, 755 A.2d at 1293, n. 10. The remedy may also be limited "as justice requires." *Id.* Nevertheless, Aquatrol has presented sufficient evidence of detrimental reliance in order for its case to proceed past the summary judgment stage. Accordingly, the Court must deny the Authority's Motion for Summary Judgment with respect to the promissory estoppel issue. (Document No. 16).

The Authority's final ground for seeking summary judgment is based on Aquatrol's failure to comply with this Court's Case Management Order. (Document No. 17, pp. 4-5). The Authority contends that Aquatrol is precluded from introducing evidence to support its claims because of its tardiness in filing a pretrial narrative statement. (Document No. 17, p. 5). The problem with the Authority's argument is that it presupposes that sanctions are warranted in this situation. The Authority's argument with regard to this matter is limited to a single paragraph, and no citations to authority are provided. (Document No. 17, pp. 4-5). Aside from direct quotations from this Court's Case Management Order, the Authority's entire argument is limited to the following passage:

"Plaintiff's pretrial narrative statement was due November 22, 2004. It was not filed. No motion was filed, and no order was entered extending the time for filing Plaintiff's pretrial narrative statement. Defendant has allowed over two weeks to elapse to give Plaintiff the opportunity to file the pretrial statement, but as of this date, it has not been filed. In accordance with the Court's Order, Plaintiff, having not listed witnesses or exhibits, is precluded from presenting any witnesses or introducing any evidence to support its claims. Thus, even if Plaintiff had a legally cognizable claim against the Authority, which it does not, such claim cannot be proven, as Plaintiff cannot present evidence to support it."

23

(Document No. 17, p. 5).

Aquatrol has briefed the issue adequately, addressing the factors which are relevant to the determination of whether sanctions should ultimately be imposed. As Aquatrol points out, the factors relevant to the question of sanctions under Federal Rule of Civil Procedure 37 are the extent of Aquatrol's responsibility for its failure to comply with the Case Management Order, the prejudice to the Authority caused by Aquatrol's failure to meet the applicable deadline, any relevant history of dilatoriness on the part of Aquatrol, whether the conduct of Aquatrol or its counsel was willful or in bad faith, the effectiveness of less severe sanctions, and the meritoriousness of the underlying claims. (Document No. 24, p. 11, n. 6) (citing *Poulis v. State Farm Fire and Cas. Co.*, 747 F.2d 863, 867-868 (3d Cir. 1984)). As the U.S. Court of Appeals for the Third Circuit recognized in *Ali v. Sims*, 788 F.2d 954 (3d Cir. 1986), there is a "strong presumption against sanctions that decide the issues of a case[.]" *Ali*, 788 F.2d at 958.

In the instant case, the Authority has failed to explain why sanctions are appropriate for purposes of the *Poulis* factors. By failing to adequately develop this issue in its brief, the Authority has waived it. The Authority's Motion for Summary Judgment cannot be granted on the ground that Aquatrol is precluded from introducing evidence at trial to support its claims. Accordingly, the Court must deny the Authority's Motion for Summary Judgment. (Document No. 16).

## AQUATROL'S MOTION TO STRIKE THE AUTHORITY'S SUPPLEMENTAL AFFIDAVIT

In support of its Motion for Summary Judgment, the Authority has filed a supplemental affidavit by Terry MacAlarney. (Document No. 26). Aquatrol has filed a Motion to Strike the affidavit for purposes of the Authority's Motion for Summary Judgment. (Document No. 27). Nevertheless, the

24

Court has determined that the Authority's Motion for Summary Judgment cannot be granted because there are several genuine issues of material fact which must be resolved by a jury. In its Motion to Strike, Aquatrol clearly states that it seeks to strike the supplemental affidavit only for purposes of the Authority's Motion for Summary Judgment. (Document No. 27, p. 1, n. 1). The Court has denied the Authority's Motion for Summary Judgment in its entirety. Accordingly, the Court must deny Aquatrol's Motion to Strike as moot. (Document No. 27).

An appropriate order follows.

25

**AND NOW**, this 31st day of August, 2006, after considering the Motion for Summary

Judgment filed by Defendant G.M. McCrossin, Inc. (Document No. 14), the Motion for Summary

Judgment filed by Defendant Altoona City Authority (Document No. 16) and the Motion to Strike

filed by the Plaintiff (Document No. 27), IT IS HEREBY ORDERED THAT the Motion for

Summary Judgment filed by Defendant G.M. McCrossin, Inc. (Document No. 14) is DENIED. IT

IS FURTHER ORDERED THAT the Motion for Summary Judgment filed by Defendant Altoona

City Authority (Document No. 16) is DENIED. IT IS FURTHER ORDERED THAT the Motion to

Strike filed by the Plaintiff (Document No. 27) is DENIED as moot.

BY THE COURT:

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

26