IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AQUATROL CORPORATION,<br>    Plaintiff, | )<br>)<br>) CIVIL ACTION NO. 3:03-252 |
| v. | )<br>) |
| ALTOONA CITY AUTHORITY and<br>G.M. McCROSSIN, INC.,<br>    Defendants. | )<br>) JUDGE KIM R. GIBSON<br>)<br>) |

## MEMORANDUM OPINION

On June 20, 2007, following Plaintiff's presentation of evidence during trial in the above-captioned matter, Defendants Altoona City Authority (hereinafter "the Authority") and G.M. McCrossin, Inc. (hereinafter "McCrossin"), both moved for judgment as a matter of law pursuant to FED. R. CIV. P. 50. After oral argument, the Court granted both motions and dismissed the three claims on which Plaintiff Aquatrol Corporation (hereinafter "Aquatrol" or "Plaintiff") sought recovery. Document No. 49. The Court also dismissed as moot McCrossin's cross-claim against the Authority and permitted the voluntary withdrawal without prejudice of the Authority's counterclaim against Aquatrol. *Id.* The Court now offers the following Memorandum Opinion in support of its previous Order.

## I. FACTUAL BACKGROUND

In 1998, the Authority contracted McCrossin to manage what is known as the Horseshoe Curve Water Treatment Facility Project (hereinafter "the Project"). In anticipation of computer problems associated with the impending millennium, part of the Project involved software upgrades to make the computer systems at five water treatment plants in Blair County, Pennsylvania, Y2K compliant. Those

1

systems utilized software from a designer named Wonderware, which allowed plant technicians to interface with the system and efficiently glean information concerning the plant's current operating conditions. Aquatrol had installed the systems in the mid-1990s.

In March 1999, McCrossin executed a Purchase Agreement (hereinafter "the Agreement") with Plaintiff for the installation and configuration of the upgraded software. The Agreement obligated Aquatrol to complete performance according to specifications from Gwin, Dobson & Foreman, Inc. (hereinafter "GD&F"), the Authority's consulting engineer. Work was to be completed by September 1, 1999. In exchange, McCrossin agreed to pay $140,849.00. McCrossin expressly reserved the right to cancel the order if it was not filled as specified.

Among other things, Aquatrol was to install upgraded Wonderware software. Cognizant that Wonderware was expected to release a new version of the relevant software in late 1999, Aquatrol suggested waiting for the new version rather than installing software that would soon be outdated. On December 9, 1999, McCrossin General Superintendent Robert F. Leahey (hereinafter "Leahey") sent a letter to Aquatrol President Jim McDermott (hereinafter "McDermott") expressing concern that the upgraded software was not operating as expected. Leahey then sent McDermott a letter dated December 17, 1999, directing Aquatrol to "proceed immediately with the computer upgrades at all facilities."

As the new year arrived, however, neither GD&F nor the Authority was satisfied with Aquatrol's performance. Letters from the Authority and its engineers dated January 7, 2000, detailed several problems afflicting the upgrades and stated that Aquatrol had not satisfactorily met its contractual obligations. GD&F employee William A. Sauserman (hereinafter "Sauserman") sent Leahey a letter stating that payment for the upgrades would not occur until these problems were

resolved. Leahey immediately forwarded this letter to McDermott, who responded on February 10, 2000, and claimed that the problems arose from glitches in the Wonderware software that Wonderware was not addressing, in violation of certain express warranties between Wonderware and Aquatrol. On March 16, 2000, Sauserman sent Leahey another letter reiterating that payment should not be made until Aquatrol completed the upgrade in its entirety. Sauserman also stated that incomplete software installations or upgrades would jeopardize the functioning of the City of Altoona's water treatment system. Leahey forwarded a copy of this letter to McDermott on March 29, 2000.

Aquatrol was unable to resolve the flaws in the Wonderware software and the Authority remained dissatisfied with Plaintiff's progress throughout 2000. On November 20, 2000, Sauserman sent Leahey a letter stating that if the upgrades were not completed in accordance with the applicable specifications as of December 31, 2000, GD&F would eliminate this portion of the Project and issue a change order-credit against McCrossin in the amount of $147,489.00. Aquatrol received a copy of that letter the next day.

On December 12, 2000, Aquatrol responded directly to the Authority. In his letter, McDermott indicated that he could ensure reliable operation of the Wonderware software provided the Authority agreed to certain equipment upgrades. McDermott proposed installing an upgraded computer in one plant to verify successful operation before proceeding with the upgrades at the four other plants. McDermott indicated that these upgrades would add to the original $140,849 contract price an additional $53,000 in hardware, software, and installation services.

The Authority responded on January 4, 2001, in a letter from its solicitor, M. David Halpern (hereinafter "Halpern"). Halpern agreed to the general terms of McDermott's proposal, but indicated

3

that the Authority would not pay for the labor and expenses associated with the new installations. It was the Authority's position that the cost of the personnel required to bring the system into compliance with the applicable specifications was part of the original contract price. Halpern's letter went on to state as follows:

> 1. You will provide personnel and equipment to upgrade one site, Plane Nine, and demonstrate within thirty (30) days of the commencement date that the facility will function in accordance with the original specifications with the upgraded system.
>
> 2. If, in fact, you are successful in bringing the one plant into compliance, you would then mirror that installation at all other facilities and, upon satisfactory completion, the Authority will pay you for the hardware and software upgrades per your proposal of December 12, 2000, attached hereto, and release the retainage for the original work, bringing this matter to a close, excepting however, any post-completion warranties provided for in the contract documents and law.

Because the Authority refused to pay any additional costs for installation, Aquatrol refused to execute this counter-proposal.

On April 24, 2001, Leahey sent McDermott a letter stating that the Authority had issued a "deduct change" for the entire amount of the subcontract and that any Aquatrol equipment still at the plants had been packaged for retrieval. In a credit change order issued to McCrossin on May 16, 2001, the Authority deleted the total value of Aquatrol's scope of the Project from McCrossin's contract.

There was no further communication between the Parties until October 1, 2001, when Aquatrol, acting on a discovery it had made the previous month, communicated to the Authority a new idea for resolving the Wonderware problems. McDermott asked to complete the upgrade of the Authority's five Aquatrol systems for the original contract price of $140,849. The Authority rejected that proposal in early 2002. On February 14, 2002, Aquatrol asked for reconsideration of that decision, making clear

4

that it only desired to perform the work McCrossin originally ordered for the original contract price. The Authority did not respond.

On June 18, 2002, Attorney Dennis J. Lewis sent a letter to both Leahey and Mark Perry, who worked for the Authority, demanding that the Authority pay Aquatrol $242,000.00. That amount included $101,111.00 for extra labor and expenses provided at the request of the Authority, as well as $140,849.00 for the original contract price. Neither McCrossin nor the Authority paid the bill. Thereafter, in July of 2002, the Authority entered into a contract with U.S. Filter Control Systems (hereinafter "U.S. Filter") to provide the needed upgrades in the five treatment plants. Under this subsequent contract, the Authority agreed to pay $966,842.00 for the upgrades, which exceeded the price of McCrossin's original subcontract with Aquatrol by $825,993.00.

On November 13, 2003, Aquatrol filed a complaint in this Court against McCrossin and the Authority. Count I stated a breach of contract claim against McCrossin, while Counts II and III alleged unjust enrichment and promissory estoppel claims, respectively, against the Authority. McCrossin answered on December 5, 2003, and stated a cross claim against the Authority for contribution or indemnity. On January 5, 2004, the Authority filed its answer, pleading a counterclaim for the $825,993.00 difference between its contract with U.S. Filter Control Systems and Aquatrol's portion of the original McCrossin contract. The Court denied motions for summary judgment and, on June 18, 2007, empaneled a jury to hear the trial in this matter. Two days later, following the presentation of Aquatrol's evidence, the Court granted Defendants' motions for judgment as a matter of law for the reasons stated herein.

**II. LEGAL STANDARD**

5

The federal rules of procedure accommodate those defendants who believe that plaintiffs have not put forth a legally sufficient quantum of evidence during the presentation of their case in chief. According to FED. R. CIV. P. 50,

> [i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
> (A) resolve the issue against the party; and
> (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

"The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." *Foster v. Nat'l Fuel Gas Co.*, 316 F.3d 424, 428 (3d Cir. 2003) (citations omitted). "[I]n entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record . . . . [and] draw all reasonable inferences in favor of the nonmoving party, [but] may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (citations omitted).

## III. ANALYSIS

As noted, Plaintiff's Complaint stated three causes of action: Count I sought damages against McCrossin for breach of contract; Count II alleged that the Authority was unjustly enriched when it failed to compensate Aquatrol for work performed; Count III asserted that the Authority induced Aquatrol to make improvements to its software and is now estopped from denying its obligations under that promise. Document No. 1, ¶¶ 23-39. For the following reasons, the Court found that all three claims failed for want of evidence upon which the jury could properly find a verdict for Aquatrol.

### A. Breach of Contract Against McCrossin

To create a triable issue of fact on its claim against McCrossin for breach or contract, Aquatrol must provide evidence of three necessary elements: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *CoreStates Bank, Nat'l Ass'n. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999) (citation omitted). Plaintiff's inability to illustrate in what way McCrossin breached the relevant contract demands that the Court dismiss this claim. The contract between Aquatrol and McCrossin obligated the former to "[f]urnish all material, labor, equipment and services as necessary for the complete and satisfactory installation" of upgrades to the computer systems at five of the Authority's treatment plants. Trial Transcript, Document No. 55, p. 28. McCrossin also reserved the right to cancel the contract if the order was not filled as specified. *Id.* at 30.

Aquatrol's original deadline for performance was September 1, 1999. Although McCrossin failed to object when Plaintiff missed that deadline, Plaintiff acknowledges that it had not substantially completed performance when the contract was cancelled in 2001. *Id.* at 35. Most revealing is McDermott's testimony regarding Aquatrol's own impressions of its performance and of McCrossin's abilities and obligations:

**Question:** At the time you were terminated, you'll agree that Aquatrol had not completed its work, had it?
**Answer:** No, but it was because of Wonderware, and we had advised them of the fact.
. . . .

**Question:** When you were terminated by McCrossin, Aquatrol had not completed its work?
**Answer:** That's correct, yes.

7

. . . .

**Question:** And that deadline was never changed by McCrossin, correct?
**Answer:** No.
**Question:** You never got an extension of time, correct?
**Answer:** No. No.
**Question:** So if you didn't complete your work by December 31, 1999, it was your understanding you wouldn't get paid, isn't that correct?
**Answer:** Yes.

. . . .

**Question:** Did you ever submit — notify McCrossin and the engineer that you considered your work substantially complete?
**Answer:** No, I didn't because we had problems all the way.
**Question:** You had problems and you did not consider your work substantially complete, isn't that a fact?
**Answer:** I would say that's true.

. . . .

**Question:** Now, did you ever submit an application for final payment to McCrossin?
**Answer:** No, I didn't.
**Question:** And isn't the reason you never submitted an application for final payment to McCrossin is that the time your contract was terminated you had not completed the work?
**Answer:** We never submitted a final invoice to McCrossin because we knew there was items and we knew we wouldn't be paid.
**Question:** That's correct?
**Answer:** We were attempting to resolve the job, but we knew that it was not to their satisfaction, we had issues over why there were issues, but we were just trying to get this done and move on.

. . . .

**Question:** [Y]ou would agree that G.M. McCrossin, that company, has done nothing wrong in connection with your subcontract?
**Answer:** I totally agree.

. . . .

**Question:** They didn't breach their terms and condition of the contract that they had agreed to comply with, did they?
**Answer:** No, unfortunately, they are the middleman.

8

*Id.* at 35- 50. That Aquatrol's own vendor frustrated Plaintiff's performance did not excuse Plaintiff from its obligations under the Agreement. McCrossin was therefore within its right to terminate the Agreement upon nonperformance. While McCrossin and the Authority gave Plaintiff opportunities to perform beyond that deadline, the right of termination arose once Aquatrol failed to adequately perform within the specified period of time. McCrossin's failure to cancel its agreement with Plaintiff on September 2, 1999, did not provide Aquatrol limitless time for performance. Aquatrol had adequate notice of the impending termination when it received the November 2000 letter warning that McCrossin would cancel the agreement if Plaintiff did not adequately perform by December 31, 2000. McDermott's sworn testimony that Aquatrol failed to substantially perform under its agreement with McCrossin provides justification for the May 2001 termination and precludes recovery on any breach-of-contract theory.

### B.     Promissory Estoppel Claim Against the Authority

Under certain circumstances, courts will enforce a promise despite the absence of consideration. The jury could have considered Aquatrol's claim for promissory estoppel if Plaintiff had presented sufficient evidence on three points: (1) that the Authority made a promise it should have reasonably expected would induce Aquatrol's action or forbearance; (2) that Aquatrol actually relied on that promise in either taking action or refraining from some action; and (3) that injustice can be avoided only by enforcing the promise. *GMH Assocs. v. Prudential Realty Group*, 752 A.2d 889, 904 (Pa. Super. Ct. 2000). Because promissory estoppel is an equitable theory, such a claim must fail in the presence of an actual contract. *Iversen Baking Co. v. Weston Foods, Ltd.*, 874 F. Supp. 96, 102 (E.D. Pa. 1995).

Moreover, the alleged promise must be express. *Paris Constr. Co. v. Research-Cottrell, Inc.*, 451 F. Supp. 938, 940 (W.D. Pa. 1978). Thus, a claim of promissory estoppel cannot succeed based on overly broad or vague implied promises. *C & K Petroleum Prods., Inc. v. Equibank*, 839 F.2d 188, 192 (3d Cir. 1988). Recovery is also foreclosed if Aquatrol acted according to its own will and not as a result of the Authority's representations. *GMH Assocs.*, 752 A.2d at 904.

In its case-in-chief, Aquatrol was unable to identify any express promise from the Authority that could support a claim for promissory estoppel. Plaintiff relied only on the encouragement it received from the Authority to render performance under the Agreement. McDermott himself drew a distinction between this encouragement and any formal promise during direct examination:

> **Question:** What if any — or did the Authority make certain promises to Aquatrol?
> **Answer:** They never made any promises, but they were encouraging us to come back and complete the job, and the implied promise was that when you complete the job you're going to get paid, obviously.
> . . . .
>
> I was never told anything, it was just a general conversation, you know, that — it was implied, you finish the job you're going to get paid.
> **Question:** And by getting paid, what do you mean by that?
> **Answer:** The original amount of $141,000.

Trial Transcript, Document No. 54, pp. 71-74. McDermott's subsequent testimony during cross examination is equally revealing:

> **Question:** Well, you've indicated that some kind of promises were made to you, haven't you?
> **Answer:** They were encouraging —
> **Question:** This is what this is about?
> **Answer:** They were encouraging us to complete the job, obviously, so that they could benefit and that we could get paid. So the promise was

10

|  | that, we'll still pay you if you finish the job. |
|---|---|
| **Question:** | Okay. And what did they — what were they going to pay you? |
| **Answer:** | The original — |
| **Question:** | The contract price, correct? |
| **Answer:** | Correct. |
| **Question:** | They weren't going to pay you — you never had a promise to pay you $221,000. They told you that — we'll pay you the contract price if you complete the job? |
| **Answer:** | Correct. |

Document No. 55, pp. 13-14. Plaintiff thus admits that the Authority never made an express promise. Furthermore, the implied promise that Aquatrol inferred was merely the express terms of the Agreement with McCrossin. Encouraging an obligor to satisfy a contractual duty by providing full performance cannot give rise to liability on a theory of promissory estoppel. Nor can Aquatrol aver that it relied on any promise from the Authority in providing services it was already obligated to perform. The presence of an express contract between Aquatrol and McCrossin, the lack of any clear promise from the Authority, and the absence of any reliance on Aquatrol's part all compelled judgment for the Authority on Plaintiff's promissory estoppel claim.

The Court acknowledges that discussions occurred between Aquatrol and the Authority for services that went beyond the scope of the Plaintiff's contract with McCrossin. McDermott testified that he did not seriously consider the Authority's proposal, however, and Plaintiff offered no evidence that it incurred any detriment in reliance on that proposal. Because Aquatrol's continued performance was still conducted pursuant to the Agreement, its fruitless negotiations with the Authority could not have supported a claim for promissory estoppel.

### C.     Unjust Enrichment Claim Against the Authority

Aquatrol also sought recovery from the Authority on grounds of unjust enrichment, another

11

theory that can protect from unfairness those that act without the safeguards of a contract. Recovery on this claim would have required a preponderance of the evidence that Aquatrol conferred some actual benefit on the Authority; that the Authority appreciated the benefit; and that the Authority accepted and retained the benefit under circumstances that would make retention without payment inequitable. *Lackner v. Glosser*, 892 A.2d 21, 34 (Pa. Super. Ct. 2006) (citations omitted). "'The most significant element of the doctrine is whether the enrichment of the defendant is unjust; the doctrine does not apply simply because the defendant may have benefitted as a result of the actions of the plaintiff." *Id.* (citations omitted). Like promissory estoppel claims, an allegation of unjust enrichment cannot succeed in the face of an express contract. *Id.* (citation omitted). Because Aquatrol rendered all of its performance in furtherance of an express contract with McCrossin, it has no claim for unjust enrichment.

## IV. CONCLUSION

For the foregoing reasons, the Court granted Defendants' Motions for Judgment as a Matter of Law.

BY THE COURT:

*(signature)*

Date: July 11, 2007

KIM R. GIBSON
UNITED STATES DISTRICT JUDGE

Cc:   All counsel of record